NOT FOR PUBLICATION

> **FILED**
> JAMES J. WALDRON, CLERK
>
> **APRIL 3, 2013**
>
> U.S. BANKRUPTCY COURT
> NEWARK, N.J.
>
> BY: s/ *Ronnie Plasner*
> JUDICIAL ASSISTANT

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In Re:<br><br>**BIOLITEC, INC.,**<br><br>Debtor. | Case No.: 13-11157 (DHS)<br><br>Judge: Donald H. Steckroth, U.S.B.J. |

## OPINION

**APPEARANCES:**

Lowenstein Sandler LLP
Kenneth Rosen, Esq.
Paul Kizel, Esq.
Wojciech F. Jung, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
***Counsel for Debtor and Debtor-in-Possession,
Biolitec, Inc.***

Cole, Schotz, Meisel, Forman & Leonard, P.A.
Laurence May, Esq.  (*pro hac vice*)
Kenneth L. Baum, Esq.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
***Co-Counsel for Parties-in-Interest,
Kelly Moran and Carol Morello***

Webber McGill LLC
Douglas J. McGill, Esq.
760 Route 10 West, Suite 104
Whippany, New Jersey 07981
***Co-Counsel for Creditor,
AngioDynamics, Inc.***

Eiseman Levine Lehrhaupt & Kakoyiannis, P.C.
Eric R. Levine, Esq. (*pro hac vice*)
Peter Reiser, Esq.    (*pro hac vice*)
805 Third Avenue
New York, New York 10022
***Co-Counsel for Parties-in-Interest,
Kelly Moran and Carol Morello***

Bond Schoeneck & King, PLLC
Joseph Zagraniczny, Esq. (*pro hac vice*)
Stephen A. Donato, Esq.  (*pro hac vice*)
Sara C. Temes, Esq.      (*pro hac vice*)
One Lincoln Center
Syracuse, New York 13224
***Co-Counsel for Creditor,
AngioDynamics, Inc.***

Trenk, DiPasquale, Della, Fera & Sodono, P.C.
Joseph J. DiPasquale, Esq.
Henry M. Karwowski, Esq.
347 Mount Pleasant Avenue, Suite 300
West Orange, New Jersey 07052
***Co-Counsel to Parties-in-Interest,
Biolitec AG, BioMed Technology Holdings,
Ltd., CeramOptec Industries, Inc., and
Wolfgang Neuberger***

The Griffith Firm
Edward Griffith, Esq.
45 Broadway, Suite 2200
New York, New York 10006
***Co-Counsel to Parties-in-Interest,
Biolitec AG, BioMed Technology Holdings,
Ltd., CeramOptec Industries, Inc., and
Wolfgang Neuberger***

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

AngioDynamics, Inc. ("AngioDynamics") has moved for entry of an order directing the appointment of a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a) ("Motion"). Opposition to the Motion was filed by Biolitec, Inc. ("Biolitec" or "Debtor"). In addition, Biolitec AG, BioMed Technology Holdings, Ltd. ("BioMed"), CeramOptec Industries, Inc., and Wolfgang Neuberger ("Neuberger"), entities related to Biolitec (collectively, "Related Entities"), filed a brief in support of Biolitec's opposition. A response was filed, in support of the appointment of a trustee, by Kelly Moran and Carol Morello (collectively, "New Jersey Plaintiffs"). AngioDynamics filed a reply in support of its Motion, in which it also sought alternative relief seeking the appointment of an examiner pursuant to 11 U.S.C. § 1104(c)(2). Biolitec filed a supplemental brief to respond to the reply of AngioDynamics.

AngioDynamics argues that "cause," as required by § 1104(a)(1), exists based upon: (i) the findings of the United States District Court for the District of Massachusetts; (ii) Biolitec's actions in the captioned bankruptcy case; and (iii) the inability of Biolitec's management to represent the best interests of Biolitec's creditors, and, alternatively, pursuant to § 1104(a)(2), arguing a trustee is in the best interests of the creditors.

Biolitec counters that AngioDynamics has not met its burden to establish clear and convincing evidence to overcome the strong presumption of leaving a debtor in possession of the estate. Additionally, Biolitec argues that the Court cannot consider the facts and findings of other courts as they are not final judgments on the merits and were not supported by evidentiary hearings, but only by allegations and declarations of parties with motives that raise questions as to credibility. Lastly, Biolitec argues that AngioDynamics cannot seek the appointment of an examiner in its reply because it violates procedural notice and hearing requirements.

3

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 1334(b), 157(a), and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984 as amended September 18, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper under 28 U.S.C. §§ 1408 and 1409(a). The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND AND FACTS

Biolitec is a member of a multi-national group of companies in the business of manufacturing and distributing fiber optic devices, medical lasers and fibers, photo-pharmaceuticals, and industrial fiber optics ("Biolitec Group"). The Biolitec Group serves global markets including Europe, Asia, the Middle East, and the United States. Biolitec is the United States affiliate of the Biolitec Group. Biolitec only engages in light manufacturing and acquires most of its products by purchasing them from the European Biolitec Group entities.

The Biolitec Group organizational structure can be constructed after a review of the various briefs and certifications submitted by the parties. Neuberger is the sole owner of BioMed. BioMed is the majority owner of Biolitec AG, holding a 75% interest. Biolitec AG is the parent to Biolitec AG Austria, Biolitec FZ, and until December 2011, was the 90% owner of Biolitec. The remaining 10% of Biolitec is held by the New Jersey Plaintiffs. As of December 2011, the 90% of Biolitec that was held by Biolitec AG was transferred to Biolitec Holdings US, Inc., which is the wholly-owned subsidiary of Biolitec FZ. It is not disputed that Neuberger is the primary owner of Biolitec and the Related Entities. While the degree to which Neuberger controls Biolitec and the related corporate entities is disputed, the fact that Neuberger has significant ownership and control over the operations is not contested.

Biolitec and the Related Entities, along with the New Jersey Plaintiffs and AngioDynamics, are parties to at least three other proceedings in different courts. As part of those proceedings, the disputed facts underlying those claims are subject to discovery, the issues are being litigated, and judgments are being appealed. Because the statuses of those proceedings, according to AngioDynamics, are relevant to the Court's decision on the present Motion, a brief summary is warranted.

*The New York Litigation*

AngioDynamics and Biolitec were parties to a Supply and Distribution Agreement dated April 1, 2002. It is alleged that, pursuant to the Supply and Distribution Agreement, Biolitec had duties to indemnify and defend AngioDynamics against patent infringement claims. During 2004 and 2005, AngioDynamics was sued by two different parties for patent infringement. From 2004 through 2008, AngioDynamics incurred $4 million in legal costs defending itself against the patent infringement suits. The two suits settled out of court, but required AngioDynamics to pay $13 million in settlement. In January of 2008, AngioDynamics brought suit against Biolitec for breach of the indemnification provisions of the Supply and Distribution Agreement in the United States District Court for the Northern District of New York (the "New York District Court").

In November of 2012, the New York District Court awarded AngioDynamics just over $23 million ("New York Judgment"). Biolitec perfected its appeal of the New York Judgment in the United States Court of Appeals for the Second Circuit on January 18, 2013. The appeal is pending.

*The Massachusetts Litigation*

In October of 2009, fearing that Biolitec was systematically funneling assets to certain of the Related Entities to make any potential judgment uncollectible, AngioDynamics brought suit in the United States District Court for the District of Massachusetts (the "Massachusetts Litigation" and "Massachusetts District Court").   The complaint alleges that Biolitec AG, BioMed, and Neuberger fraudulently removed assets amounting to $18 million from Biolitec to render the Debtor judgment proof.  The complaint seeks to pierce the corporate veil, to collect judgment from the parent and related entities of Biolitec, and to void the alleged $18 million in fraudulent transfers.

In August of 2012, AngioDynamics sought a preliminary injunction from the Massachusetts District Court to freeze the defendants' assets and prohibit Biolitec AG from completing a downstream merger with Biolitec AG Austria.   Biolitec and its co-defendants contested the motion, but finding that the complaint contained "highly detailed allegations of corporate misconduct, including fraud . . ." that, "if true, describe a shocking pattern of corporate looting . . . ," Judge Ponsor of the Massachusetts District Court first entered a temporary restraining order and then a preliminary injunction on September 13, 2012 ("Massachusetts Injunction").  The Massachusetts Injunction prevented Biolitec from transferring its assets and also prevented Biolitec AG from merging with its Austrian subsidiary, Biolitec AG Austria.  No evidentiary hearing was held, but Judge Ponsor stated that the pleadings presented by AngioDynamics showed an

> extraordinarily dramatic diminution in [Biolitec's] assets and an increase in its debt just in the last three years . . . .  All this points strongly to a deliberate course of conduct on the part of [Biolitec AG's] principals, including Mr. Neuberger . . . to move assets out of [Biolitec] in order to avoid having to pay the judgment that

AngioDynamics has obtained in the Northern District of New York.

(Mot. of AngioDynamics, ¶ 10)  On December 14, 2012, the Massachusetts District Court denied a motion for reconsideration of the Massachusetts Injunction.  In so ruling,  Judge Ponsor found that there were "troubling questions about the Defendants' good faith" in light of the undisputed fact that, after the Massachusetts Injunction was entered, Biolitec AG and related entities had taken preliminary steps toward completing the merger between Biolitec AG and Biolitec AG Austria by securing a shareholder vote on the merger.  (Mot. of AngioDynamics, ¶ 18)  The defendants filed an expedited appeal from the Massachusetts Injunction with the United States Court of Appeals for the First Circuit.  That appeal was heard on April 1, 2013 and the First Circuit ruled the same day affirming the Massachusetts Injunction, finding the appeal to be without merit.  *AngioDynamics, Inc. v. Biolitec AG, et al.*, No. 12-2044, 2013 WL 1294450 (1st Cir. Apr. 1, 2013).

Subsequent to oral argument on the Motion in this Court, but prior to the decision of the First Circuit, counsel for Biolitec AG advised the Court that the downstream merger had taken place and that, while it does not believe the Massachusetts Injunction was violated because its corporate headquarters had not moved from Germany to Austria, any dispute with regard to the Related Entities' compliance with the Massachusetts Injunction should be adjudicated in the Massachusetts District Court.  Counsel for AngioDynamics asserts the merger is further evidence of the culpable conduct and inability of the Related Entities to act in the interest of creditors of Biolitec and support this Court's appointment of a trustee.

*The New Jersey Litigation*

In June of 2009, New Jersey Plaintiffs, Moran and Morello, former officers of Biolitec, filed an action in the Superior Court of New Jersey Chancery Division ("New Jersey Chancery

Court") against Biolitec, Biolitec AG, Neuberger, and BioMed Technology Holdings, Ltd. ("New Jersey Litigation").  The New Jersey Litigation was filed after Moran and Morello's termination in 2009.  The complaint alleges, without verification, that the New Jersey Plaintiffs have been harmed by oppressive and illegal conduct of Biolitec's majority shareholders. Specifically, it alleges that Neuberger acted fraudulently, mismanaged the corporation for his personal benefit, abused his authority as an officer and director, and acted oppressively to the New Jersey Plaintiffs as minority shareholders.  The New Jersey Plaintiffs contend that more than $15 million in cash and assets were fraudulently and illegally transferred from Biolitec.

In their brief in support of the appointment of a trustee, the New Jersey Plaintiffs advise that Biolitec failed to comply with discovery orders of the New Jersey Chancery Court and that its non-compliance resulted in its answer being struck without prejudice, $470,000 in sanctions for discovery violations ($613,000 if two pending motions are resolved in favor of the New Jersey Plaintiffs), and appointment of a discovery master.  Additionally, they assert that the New Jersey Litigation has established that Neuberger receives unlimited interest-free loans from Biolitec, which have no due date, called "officer loans."  It must be noted that the New Jersey Plaintiffs' complaint is not verified by either of the plaintiffs and that in support of AngioDynamics' motion, counsel simply filed a brief without supporting certification from the individuals.  Thus, nothing evidential has been presented by the New Jersey Plaintiffs in support of the Motion.

## The Bankruptcy Proceeding

Biolitec filed its petition for Chapter 11 relief on January 22, 2013.  In the Declaration of Brian Foley in support of Biolitec's petition and first day motions, he stated that Biolitec was forced to file bankruptcy due to a series of errors made by Kelly Moran, the former Chief

Operating Officer and one of the New Jersey Plaintiffs, that resulted in almost $10 million in losses and $12 million in litigation defense fees between 2008 and 2009.

Biolitec immediately sought relief from the automatic stay to allow the other litigations to continue. With respect to the New Jersey Litigation, the Court granted relief from the automatic stay to allow the New Jersey Plaintiffs to proceed with their claims of shareholder oppression against Biolitec and the other New Jersey Litigation defendants. As to the Massachusetts Litigation, Biolitec sought relief so that it and the other defendants in the Massachusetts Litigation could proceed with their appeal of the Massachusetts Injunction. In this regard, this Court noted that the automatic stay did not affect nor prevent the Related Entities in the Massachusetts Litigation from continuing with their appeal of the Massachusetts Injunction. During that hearing, the Court first noted the acrimony among the parties and the allegations of suspicious conduct of Neuberger and the Related Entities.

Biolitec filed supplemental certifications in response to the reply of AngioDynamics. Introduced in opposition to the appointment was evidence of secret communications between Moran, Morello, and Stefan Spaniol, a former officer of Biolitec AG and member of the executive board of management, suggesting that the three former employees have been conspiring to drive Biolitec out of business and solicit Biolitec customers. It is alleged that the communications reveal that Spaniol, Moran, and Morello have worked with AngioDynamics to create Fiber Optec Fabrications, Inc. ("FFI") to compete with Biolitec and solicit its customers.

*The Supplemental Affidavits and Declarations[1]*

*Affidavit of John R. McGrath*

John McGrath provided an affidavit in support of AngioDynamics' Motion to appoint a trustee. McGrath was retained to render an expert opinion as to whether the various transactions from Biolitec to the Related Entities were supported by adequate documentation and whether they may have been used to transfer value out of Biolitec to foreign affiliates. Highlighting that discovery was not yet completed, he made the following comments with respect to the losses incurred by Biolitec:

> Based on the information reviewed to date, it is unquestioned that BI's assets decreased from $24,985,600 in 2008 to $10,899,835 in 2011. This is the same finding made by U.S. District Judge Ponser [sic] in his Memorandum and Order Regarding Emergency Motion for Reconsideration of Preliminary Injunctions, dated December 14, 2012. The reduction resulted from several transactions which do not appear to be in the ordinary course of business and included the transfer of intellectual property rights to a foreign affiliate of BAG, the sale of BI's real property to another US affiliate, the questionable intercompany allocation of expenses from foreign affiliates to BI, the periodic liquidation of excess quantities of certain Laser inventory, the extent to which BI unilaterally incurred legal fees and that also benefited other BAG affiliates (who should have shared in the expense thus reducing BI's expenses) and the payment of personal expenses for Neuberger.

(McGrath Aff., ¶ 11)  Specifically, McGrath cites to a lack of documentation, questionable audit procedures from 2006 through the present regarding inter-company transfers, and a recent qualified audit opinion issued by BDO, the accounting firm hired to audit the financial statements of Biolitec AG.

---

[1] Affidavit of John R. McGrath, Feb. 21, 2013 ("McGrath Aff.), (AngioDynamics' Reply, Ex. A); Declaration of Stefan Spaniol, Feb. 21, 2013 ("Spaniol Decl.), (AngioDynamics' Reply, Ex. B); Supplemental Declaration by Art Henneberger, Feb. 28, 2013 ("Henneberger Decl."), (Debtor's Suppl. Obj. to Mot., Attach. 1); Declaration of Brian Foley, Feb. 28, 2013 ("Foley Decl."), (Debtor's Suppl. Obj. to Mot., Attach. 2); Declaration of Edward Griffith, Feb. 28, 2013 ("Griffith Decl."), [Dock. 80].

_Declaration of Stefan Spaniol_[2]

Stefan Spaniol, the general manager of a subsidiary of Biolitec AG and primary manufacturing entity of the Biolitec Group, and Chief Scientific Officer and executive board member of Biolitec AG from 1999 through 2009, swears to many of the factual allegations forming the basis of the other pending suits against Biolitec and Related Entities.  Spaniol declares that Neuberger instructed him to make $50,000 charges from Biolitec to Biolitec Pharma Ireland without any services provided to remove assets from the United States to Europe. Spaniol declares that these "cross-charges" were an effort to protect vulnerable assets from United States creditors, such as AngioDynamics and the New Jersey Plaintiffs.  Spaniol further states that Neuberger removed the corporate controller of Biolitec AG, August Günter, and maintained minimal accounting staff, in an effort to frustrate outside auditors' review of the inter-company transactions and debt.    Lastly, Spaniol declares that the sale of lasers to Biolitec at a premium and the transfer of intellectual property from Biolitec for approximately 20% of its value was all an effort to shield assets from judgment creditors such as AngioDynamics.

_Declaration of Art Henneberger_

Art Henneberger, Chief Financial Officer of Biolitec, made the following declarations in response to "the unsworn and unverified 'response' of Creditors Kelly Moran and Carol Morello," McGrath's Affidavit, and Spaniol's Supplemental Declaration.  Henneberger first declares that he has provided all of Biolitec's financial records, produced tens of thousands of other documents, and sat, himself, for several depositions under oath on these issues.  He declares that everything provided demonstrates that the decline in assets is a result of operating

---

[2] Dr. Wolfgang Neuberger filed a Supplemental Declaration in which he objects to each of the assertions made by Spaniol with respect to his allegedly giving instructions regarding the transfers at issue as well as any attempts by him to assert threats or terminate Biolitec employees for questioning his direction to execute the transfers.  (Suppl. Decl. of Dr. Wolfgang Neuberger, Feb. 27, 2013), (Debtor's Suppl. Obj. to Mot., Attach. 4).

losses during 2008 to 2009 due to the failed sales strategy of New Jersey Plaintiff, Moran, and the extraordinary legal fees incurred.

Henneberger also addresses the real estate transactions and the intellectual property transfers. He declares that, upon further investigation following the deposition in which the real estate issue was raised, he provided evidence that Biolitec was reimbursed for the transactions. With respect to the transfer of the intellectual property, Henneberger states that the patents that were transferred by Biolitec for $1,000,000 were previously transferred to Biolitec for no value by another Biolitec entity, and, thereby, resulted in a net gain for Biolitec.

Lastly, Henneberger addresses the outside auditors of Biolitec and Biolitec AG. First, with respect to the audit of the inter-company transactions by Biolitec, the auditors advised that the audit is more properly conducted by Biolitec AG's independent outside auditors. Secondly, Henneberger highlights that the only issues with Biolitec AG's audit report was that the auditors were unable to assess the risks associated with the United States litigations against Biolitec and the Biolitec Group and did not address the allegations of unsupported transactions.

### *Declaration of Brian Foley*

Brian Foley, the Chief Operating Officer of Biolitec, made his declaration to refute issues raised by McGrath's Affidavit, specifically with respect to the management and cost of the laser inventory. Foley explains that New Jersey Plaintiff Moran applied an inaccurate sales forecast and instructed him to order enough lasers to meet the projected demand and that at no time was there any belief that it was being ordered by Neuberger. This was supported by the deposition taken of Moran in which Moran states that Foley only ordered lasers with authorization from Moran. Foley indicates that Moran's failed strategy, including excessive commission paid to sales representatives and over-projections, led to Biolitic's substantial operating losses.

With respect to the price paid by Biolitec for the lasers, Foley declares that the increase in price from $25,000 to $50,000 was a reflection of the market maturing and that this price was below the market price of $100,000 and bulk price of $84,000 when the same products are sold by Biolitec.  Furthermore, Foley provides documentation that Moran knew of the price increase when she placed the orders.

*Declaration of Edward Griffith*

Edward Griffith, Esq., attorney for Biolitec AG, BioMed Technology Holdings, Ltd., and Neuberger, makes his declaration to address the issues raised by the New Jersey Plaintiffs with respect to the discovery sanctions imposed in the New Jersey Litigation.  First, Griffith highlights that he was not initial counsel to the Biolitec defendants in the New Jersey Litigation and was substituted in as counsel after a conflict of interest with prior counsel was discovered. The conflict was that prior counsel represented AngioDynamics in the Massachusetts Litigation, alleging similar causes of action against the same Biolitec defendants.  Griffith states that all of the discovery sanctions imposed against the Biolitec defendants were during prior counsel's representation.  Griffith goes on to declare that since his substitution a year ago, the Biolitec defendants have complied with all of the discovery requests.  They are also in the process of appealing a number of the sanctions.  Additionally, Griffith declares that no judgments have been made on the merits in the New Jersey Litigation and advises no summary judgment motions have been decided or discovery completed.

## DISCUSSION

AngioDynamics argues that the appointment of a trustee is required under 11 U.S.C. § 1104(a).  Alternatively, AngioDynamics seeks the appointment of an examiner pursuant to § 1104(c)(2).

## I.     <u>Whether a Trustee Shall be Appointed</u>

AngioDynamics, supported by the New Jersey Plaintiffs, argues that appointment of a trustee is required because "cause" exists under § 1104(a) of the Bankruptcy Code. Section 1104(a) provides that,

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

11 U.S.C. § 1104(a)(1). Relying on *In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989), AngioDynamics argues that evidence of "systematic looting," as found by the Massachusetts District Court, together with common control, inter-company transfers, and intermingled business assets, creates a conflict among the Related Entities and the Debtor such that "cause" is established requiring the appointment of a trustee. Biolitec counters, arguing that the evidence relied on by AngioDynamics amounts to preliminary findings and mere allegations that do not support the appointment of a trustee and, therefore, consistent with the teachings of *In re G-I Holdings*, 385 F.3d 313 (3d Cir. 2004), AngioDynamics has not met its burden of showing clear and convincing evidence of "cause."

The Court must initially address the Debtor's argument that AngioDynamics cannot meet its burden of showing clear and convincing evidence for the appointment of a trustee because the Court may not consider the findings of fact and conclusions of law made at the preliminary injunction stage by another court. In support, Biolitec relies on *Clark v. K-Mart Corp.*, 979 F.2d 965 (3d Cir. 1992), *University of Texas v. Camenisch*, 451 U.S. 390 (1981), and *Sasson*

*Licensing Corp. v. Monte Carlo Shirt, Inc.*, 1990 WL 157318 (S.D.N.Y Oct. 15, 1990). AngioDynamics counters that the authority cited by Biolitec is distinguishable and, moreover, that the Order of the Massachusetts District Court in issuing the Massachusetts Injunction was based on more than allegations alone, contending that it was based on substantial affidavits, establishing facts that were undisputed by the Related Entities and, further, that these findings, in combination with the cumulative evidence presented to this Court, establish clear and convincing evidence.

In reviewing the authority relied on by Biolitec, each is distinguishable from the case at bar. In *Clark v. K-Mart Corp.*, the Third Circuit found that a court could not give deference at trial to the findings of fact and conclusions of law made at the preliminary injunction stage. In *University of Texas v. Camenisch*, the Court held that it is inappropriate for findings of fact and conclusions of law made by a court granting a preliminary injunction to be dispositive at a subsequent trial on the merits. In *Sasson Licensing Corp. v. Monte Carlo Shirt, Inc.*, the court expressly held that the "Defendant [was] clearly correct in stating that it is generally inappropriate for findings made at a preliminary injunction hearing to be given preclusive effect at later proceedings," but that, "[i]t does not follow, though, that [a] Court must disregard testimony given at the preliminary injunction hearing for purposes of later proceedings, particularly, if that testimony remains undisputed by defendant." *Sasson*, 1990 WL 157318, at *2.

Here, unlike the cases cited by Biolitec, this Court is not seeking to make a final adjudication on the merits of the claims of fraud and looting being pursued in the Massachusetts Litigation. The Court is satisfied that the findings made in the Massachusetts District Court were made after deliberation upon the evidence before it and considers the preliminary findings of that

15

court as part of the totality of the circumstances evidencing conflicts among the parties.  While

not dispositive, they may properly be considered by this Court in exercising its discretion

whether to appoint a Chapter 11 trustee.

"Subsection (a)(1) requires the bankruptcy court, upon motion, to appoint a trustee when

the movant has proved 'cause,'" which the statute defines to include "fraud, dishonesty,

incompetence, or gross mismanagement of the affairs of the debtor . . . either before or after

commencement of the case . . . ." *Sharon Steel*, 871 F.2d at 1226 (citing § 1104(a)(1)).  While a

bankruptcy court is required to appoint a trustee where it finds "cause," the determination of

whether the moving party has satisfied its burden in showing "cause" is committed to the

bankruptcy court's discretion.  *G-I Holdings*, 385 F.3d at 318 (citing *Sharon Steel*, 871 F.2d at

1225-26)).  It is settled law in the Third Circuit that the appointment of a trustee is the exception,

rather than the rule, and is relief granted only as a last resort.  *Sharon Steel*, 871 F.2d at 1225.

The movant must prove the need for a trustee by clear and convincing evidence.  *Id.*   Evidence

is "clear and convincing" when

> it produces in the mind of the trier of fact a firm belief or
> conviction as to the truth of the allegations sought to be
> established, evidence so clear, direct and weighty and convincing
> as to enable the fact finder to come to a clear conviction, without
> hesitancy, of the truth of the precise facts in issue.

*In re G-I Holdings*, Inc. 295 B.R. 502, 507–08 (D.N.J. 2003) (internal citations omitted), *aff'd*,

385 F.3d 313 (3d Cir. 2004).  The appointment of a trustee is made on a case-by-case basis, after

considering the totality of the circumstances.  *Id.* at 507 (citing *Sharon Steel*, 871 F.2d at 1226).

Three cases addressed by the Third Circuit Court of Appeals command attention.

In *Sharon Steel*, a case with facts similar to those before the Court, the appointment of a

trustee by the bankruptcy court was appealed by Posner as the Chairman, President and CEO of

Sharon Steel, the debtor-in-possession, and DWG Corporation, an entity under common control with Sharon Steel.  871 F.2d at 1218.  The Third Circuit reviewed the bankruptcy court's findings for an abuse of discretion.  Those findings included numerous pre-petition transfers to insiders and secured creditors which "amounted at best to voidable preferences and at worst to fraudulent conveyances" and also that the debtor-in-possession had not sued on any of those transfers.  *Id.* at 1220-21.   Furthermore, "the bankruptcy court questioned the current management's ability to fulfill its fiduciary duty to pursue these claims since [the debtor] shares common management with the recipients of the transfers, who also owe conflicting fiduciary duties to recipients.  Disclosure of the transfers did not cure the preferential or fraudulent transfers."  *Id.* at 1221.  The bankruptcy court also observed day-to-day mismanagement of the estate, including the failure of Sharon Steel to close its financial books, absence of post-petition profit and loss statements, a failure to renegotiate the terms of its working capital loan, and the excessive fees expended, nearly $280,000, in defending the motion to appoint a trustee.  *Id.*

The Third Circuit ultimately found that the bankruptcy court had not abused its discretion in finding clear and convincing evidence of "cause" for appointment and, alternatively, that it was in the best interest of creditors based on the mismanagement of the estate.  *Id.* at 1229.  The Third Circuit recognized authority holding that business dealings between debtors and affiliated entities do not per se create a conflict of interest, but that based on the "systematic syphoning of Sharon's assets to other companies under common control . . . such behavior raises grave questions about current management's ability to fulfill its fiduciary duty as debtor-in-possession to Sharon's creditors."  *Id.* at 1228.  Lastly, the Third Circuit found that the debtor's allowance of the committee to pursue the recovery of the transfers did not resolve any questions about "current management's fitness to continue running Sharon Steel and its commitment to see it

17

through to a successful reorganization" and that the ongoing issues of allocation of assets between related entities was "exacerbated by the conflicts of interest, and only an independent trustee can make a proper investigation and determination of the best interests of Sharon." *Id.*

Circumstances involving allegations of acrimony and conflicts of interest, like the case at bar, pose considerable challenges for bankruptcy courts. "A bankruptcy court cannot be expected to resolve all factual disputes that are the subject of various ongoing litigations in determining a motion for appointment of a trustee," even where, if proven, those factual disputes and challenged actions would mandate appointment of a trustee. *G-I Holdings*, 295 B.R. at 510. This issue was first addressed by the Third Circuit in *In re Marvel Entertainment Group, Inc. See* 140 F.3d 463, 472 (3d Cir. 1998) ("We have not heretofore addressed the question of whether acrimony between debtor and creditor in a bankruptcy case may rise to the level of 'cause' necessitating the appointment of a trustee under § 1104(a)(1)."). The Third Circuit found that the Code itself "does not prohibit the appointment of a trustee based on a finding of acrimony between debtor and creditor, parties whose interests must be balanced and protected under the discretion of the court," and, further, that "a court may find cause to appoint a trustee for 'acrimony' only on a case-by-case basis, when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or . . . when the parties 'begin working at cross-purposes.'" *Id.* at 472–73. By contrast, it is also within the bankruptcy court's discretion not to consider allegations made in other proceedings where they do not rise to clear and convincing evidence of "cause" and allow those issues to be resolved in the other courts already adjudicating those facts and issues. *See G-I Holdings*, 385 F.3d at 321.

In *Marvel*, two entities, each controlled by a single person, Carl Ichan ("the Ichan Entities"), purchased a large portion of pre-petition debt claims and bonds from holding

companies that owned substantially all of Marvel's stock.  140 F.3d at 467.  Subsequently, over

the objection and restraining order by lenders of Marvel, the Ichan Entities successfully took

control of Marvel by infusing $365 million in Marvel.  *Id.* at 467.  The Ichan-controlled debtor-

in-possession commenced an action in the district court against the holding companies, lenders,

and other creditors alleging fraud, breach of fiduciary duty, fraudulent conveyance, preferential

transfers, and breach of contract.  *Id.* at 468.  Further, the complaint contained allegations of

conspiracy to "sabotage" the reorganization.  *Id.*  The lenders then renewed their previous motion

for the appointment of a trustee.  *Id.*  The district court, which heard oral argument regarding the

appointment of a trustee, observed that the arguments contained many of the allegations of the

district court complaint, including that the lenders' efforts were intended to frustrate

reorganization, that the Ichan Entities acting as debtors-in-possession had an elaborate scheme to

take over Marvel and diminish the value of the lenders' claims, were incapable of neutrality, and

guilty of breaching their fiduciary duty.  *Id.* at 468–69.  The Third Circuit agreed in upholding

the appointment of a trustee.  *Id.* at 474.

The *G-I* court reached a different conclusion on similar facts.  In *G-I*, the debtor, G-I

Holdings, Inc., was a holding company for, in addition to others, GAF Corporation, which served

as a holding company for two operating businesses.  *G-I Holdings*, 295 B.R. at 504.  The

network of related entities was in the business of producing asbestos and asbestos-containing

products.  *Id.*  G-I, as holding company and parent to those operating companies, succeeded to

the liability of those operating companies that faced more than 150,000 mass tort litigations for

asbestos-related claims.  *Id.* at 505.  The principal shareholder of G-I, Heyman, created another

corporation, Building Material Corporation of America ("BMCA"), to assume portions of GAF's

business and also to shield it from liability stemming from the asbestos suits.  *Id.*  G-I then

sought and was granted a preliminary injunction preventing the assertion of present and future asbestos claims against BMCA. *Id.* In effect, BMCA, now a subsidiary of G-I, held G-I's roofing and building products business and was insulated from the asbestos-related claims. *Id.* The creditors' committee argued that a trustee must be appointed to pursue the fraudulent-transfer and preference-avoidance actions due to the common control of BMCA and G-I by Heyman and the excessive conflict between G-I and its principal creditors. *Id.* at 506–07.

The district court in *G-I* first addressed whether, in light of *Marvel*, a strong presumption could be applied in favor of maintaining current management. *Id.* at 509. It distinguished *Marvel*, where the Third Circuit held that the presumption did not apply, and noted that in *Marvel,* the debtor-in-possession had taken control of the debtor six months after the chapter 11 petition was filed and had no experience in managing or operating the debtor. *Id.* By contrast, the management of G-I had been in place for years and was familiar with the company's operations. *Id.* (internal citations omitted). In addition, the district court noted that the debtor-in-possession in *Marvel* was also a substantial creditor of *Marvel*, which made it impossible to act as a fiduciary to all creditors. *Id.* at 510. The district court concluded by observing that the bankruptcy court had not clearly erred in finding that the committee failed to present clear and convincing evidence that a trustee was necessary where it had not demonstrated that the appointment of a trustee would aid or augment the success of the debtor's reorganization, particularly in light of the fact that the allegations between the parties would be resolved in other pending proceedings. *Id.* at 511.

The Court is not blind to the acrimony between AngioDynamics and Biolitec, two entities each with roles crucial to a successful reorganization of Biolitec. Even without considering whether the allegations and findings of the other litigations are true, there is no doubt that

extreme acrimony exists between the parties.  There are multiple litigations between Biolitec, the Related Entities, and AngioDynamics, including the appeal of the New York Judgment, the action in the Massachusetts District Court, and the recently decided appeal with regard to the Massachusetts Injunction.  Furthermore, Biolitec and its Related Entities are involved in the New Jersey Litigation defending against claims of minority shareholder oppression by former officers. Lastly, considering that the allegations of fraudulent transfers leading up to the bankruptcy are made by AngioDynamics, a judgment creditor holding 98% of the Debtor's unsecured claims, Biolitec's ability to instill confidence in creditors of the estate sufficient to complete a successful reorganization is severely jeopardized.

Most significant in the Court's judgment is that Biolitec, as debtor-in-possession, is intimately tied through common ownership and control with Neuberger and the Related Entities, the recipients of alleged fraudulent and preferential transfers.  It cannot be ignored that Neuberger controls the majority interest in the Debtor and the Related Entities.  He is the sole owner of BioMed, which holds a 75% interest in Biolitec AG which, in turn, is the parent of Biolitec AG Austria and Biolitec FZ.  Through his majority ownership of Biolitec FZ, and Biolitec Holdings US, Inc., he controls Biolitec, the Debtor before this Court.  The completion of the merger by Biolitec AG after the oral argument on this Motion, an apparent violation of the Massachusetts Injunction, is an act that must weigh heavily on this Court's determination when considering the degree of commonality among the Debtor and Related Entities.  While non-debtors violated the Massachusetts Injunction and not an order of this Court, the merger was undertaken and authorized by the Supervisory Board of Biolitec AG, an entity which is the target of fraudulent transfer actions and under common control and ownership with the Debtor.

This Court is not faced with a scenario wherein the debtor-in-possession lacks experience in managing the debtor's business.  To the contrary, and unlike the debtor-in-possession in *Marvel*, Biolitec management has been in place for years prior to the petition date running a multi-national manufacturer and distributor of high-tech medical and industrial devices.  Current management has experience that may be critical to Biolitec as well as its creditors.  It would be naive to think, however, that management can operate independent from the controlling ownership of Neuberger.  Management's experience does not outweigh the challenges to reorganization and trust in the Debtor that flow from the commonality of control exercised by Neuberger and the Related Entities, particularly in light of their pre- and post-petition conduct. That conduct demonstrates that current management, which lacks sufficient independence from Neuberger, is unable to act as a disinterested fiduciary for the estate, maintain the confidence of creditors, and is unlikely to complete a successful reorganization.  The purpose of a trustee is to aid or augment the success of a debtor's reorganization.  *G-I Holdings*, 295 B.R. at 511.  A trustee's ability not only to manage the Debtor's operations, but to oversee the Debtor's rights and interests in those proceedings will aid in the reorganization as it will isolate the control of Neuberger and hopefully instill creditor confidence.  Cause is found for the appointment of a trustee to act as a fiduciary pursuant to § 1104(a)(1).  It is clear a trustee is appropriate considering the relationship of the parties and their conduct before this and other courts.

Alternatively, AngioDynamics argues that appointment of a trustee is proper pursuant to 11 U.S.C. § 1104(a)(2).  Section 1104(a) provides that

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
> . . .

> (2) if such appointment is in the interests of creditors, any equity
> security holders, and other interests of the estate, without regard to
> the number of holders of securities of the debtor or the amount of
> assets or liabilities of the debtor.

11 U.S.C. § 1104(a)(2).  Unlike § 1104(a)(1), which provides for mandatory appointment upon a specific finding of cause, § 1104(a)(2) "envisions a flexible standard."  It gives the court discretion to appoint a trustee "when to do so would serve the parties' and estate's interests." *Marvel*, 140 F.3d at 474 (based on the acrimony found between the parties, even if appointment was not mandated under (a)(1), it falls within the flexible standard of (a)(2)) (citing *Sharon Steel,* 871 F.2d at 1226).  In light of the flexible standard of (a)(2), there is sufficient basis to appoint a trustee where there is a "deep-seated conflict between the debtor and its creditors" and where the case is sufficiently complex and the "parties are sharply divided on many issues, and are presently incapable of resolving them . . . ." *Id*. at 475.

For similar reasons as discussed above, and it being within the Court's discretion to appoint a trustee pursuant to § 1104(a)(2), sufficient evidence has been presented to determine that an appointment is in the best interests of creditors and the estate.  Biolitec, while profitable under current management and control leading up to the current chapter 11 petition, fails to have sufficient independence from Neuberger and the Related Entities that engaged in conduct adverse to the interests of creditors.  Considering the deep-seated conflicts between the parties and their inability to resolve them, the commonality among the Debtor, Neuberger, and Related Entities will likely be an obstacle to a successful reorganization and, therefore, appointment of a trustee is in the best interest of creditors and the estate.  As such, the Motion is granted insofar as it seeks appointment of a trustee pursuant to § 1104(a)(2).

**II.**    **Whether an Examiner Should be Appointed**

Alternatively, AngioDynamics requests that, in the event a trustee is not appointed, an examiner be appointed pursuant to § 1104.  The Court makes no determination with respect to the request for the appointment of an examiner as the request and related arguments are rendered moot by the Court's appointment of a trustee.

**CONCLUSION**

For the reasons set forth above, AngioDynamics' request for the appointment of a trustee pursuant to 11 U.S.C. § 1104(a) is granted.

An Order in conformance with this Opinion has been entered by the Court and a copy attached hereto.

*s/    Donald H. Steckroth*

_____
DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated:    April 3, 2013